**Joseph GRAYZEL, Plaintiff,**

v.

**ST. JUDE MEDICAL, INC., St. Jude Medical, Daig Division, Inc., and St. Jude Medical S.C., Inc., Defendants.**

**No. CIV.A. 01–CV–3737JLL.**

United States District Court, D. New Jersey.

Oct. 29, 2004.

468

Kramer Levin Naftalis & Frankel LLP, New York City, Barry Evans, John E. Daniel, and Jonathan S. Caplan, and Saiber Schlesinger Satz & Goldstein, LLC, Newark, NJ, Arnold B. Calmann, for Plaintiff.

Irell & Manella LLP, Los Angeles, CA, Morgan Chu, Jonathan H. Steinberg, Andrei Iancu, and Richard G. Frenkel, and McCarter & English, LLP, Newark, NJ, Harvey C. Kaish, for Defendants.

## OPINION & ORDER

LINARES, District Judge.

### INTRODUCTION

This matter is before the Court on the motion of defendants St. Jude Medical, Inc.; St. Jude Medical, Daig Division, Inc.; and St. Jude Medical S.C., Inc., for summary judgment based on invalidity of claims 13, 14, and 16 of plaintiff's '960 patent. There was no oral argument. *See* Fed.R.Civ.P. 78. For the reasons set forth below, defendants' motion is GRANTED.

### BACKGROUND

I. *Subject Matter of the Patent Dispute*

This case concerns the insertion of catheters into human veins. In 1953, Dr. Ivar Seldinger developed a technique that enabled practitioners to avoid the undesirable practice of cutting into a blood vessel or making a new needle puncture each time a catheter[1] was inserted. The so-called "Seldinger technique" involved insertion of a guidewire through the bore of the needle during the initial puncture of the vessel. The needle was then removed, leaving the guidewire in the vein. A cath-

---

[1] A "catheter" is "[a] long, thin hollow surgical instrument, usually flexible and with one or more lumina, that is inserted into a body cavity ... for the purpose of drainage or for the administration of diagnostic or therapeutic agents." Churchill's Medical Dictionary 310 (1989).

eter could then be advanced over the guidewire and into the existing puncture. The guidewire was then removed, enabling the practitioner to insert other devices through the catheter.

In 1965, Drs. Donald Desilet and Richard Hoffman improved upon the Seldinger technique. They introduced a flexible sheath[2] on top of the catheter. The introducing catheter, or "dilator," carried the sheath into the puncture over the guidewire. Then, the catheter and guidewire were removed, leaving the sheath in place. Various devices, including multiple catheters, could then be inserted and removed through the sheath, eliminating the need for reinsertion of such devices into the puncture and the trauma resulting therefrom. This procedure became known as the "modified Seldinger technique."

## II. *Plaintiff's Purported Innovation and the Prosecution History of His Patent*

On July 8, 1987, plaintiff applied to the Patent and Trademark Office ("PTO") for a patent. His proposed invention was a further improvement upon the modified Seldinger technique. Specifically, plaintiff claimed to be introducing the concept of a "beveled" tip, or sloped edge, to the Seldinger catheter and the Desilets–Hoffman sheath, as well as visible markings on the sheath to determine the position and orientation of the beveled tip in the vein. (Pl.'s Patent Application at 1.) The problem with the existing methodology, plaintiff submitted, was that the blunt tips of the catheter and sheath, as taught by the prior art, entailed entry of the entire diameter of the

tubes into the puncture at one time, which required "considerable" force and an abrupt "pop[ping] through" the puncture hole that risked causing "additional trauma or tearing at the puncture site." (*Id.* at 2–3, 5.) Plaintiff's beveled tips facilitated entry into the puncture and reduced trauma.

The PTO Examiner rejected plaintiff's application *in toto*. With respect to the beveled tip, he stated: "The use of beveled ends for the purpose of permitting smooth entry into a body vessel is conventional as shown by both [the] Ring and Plzak [patents]." (PTO Rejection of 1/22/88, at 3.) Further, the Examiner found "[t]he feature of marking the leading point of .the bevel [to be] conventional as, shown by [the] Roehr [patent]." (*Id.*) He also noted that "[the] Evans [patent] shows markings on catheters for axial length distances etc." (*Id.* at 4.)

Plaintiff filed .a response with various amendments narrowing the claims. For example, to the proposed claim concerning the sheath, he added the following underlined language: "A sheath *of a size for use in the vascular system* [for use in conjunction with an introducing catheter] for assisting in the.insertion of other devices in blood vessels *through the wall of the blood vessel* . . . ."[3] (Pl.'s Resp. of 5/25/88, at 5.) This amendment, plaintiff maintains, clarified that his invention was limited to the percutaneous[4] method of vascular access. (Pl.'s Markman Br. at 15–16.) It also distinguished his innovation from the prior art cited by the Examiner. (Pl.'s Resp. of 5/25/88, at 8–11.)

---

**2.** A "sheath" is "[a] specially designed tubular instrument through which special obturators or cutting instruments can be passed, or blood clots, tissue fragments, calculi, etc. can be passed." Stedman's Medical Dictionary 1280 (24th ed.1982).

**3.** The language in brackets was part of the original claim and omitted from plaintiff's amendment.

**4.** "Percutaneous" means "through the skin." Churchill's Medical Dictionary 1408 (1989).

The PTO Examiner again rejected this claim and others. In particular, concerning the beveled sheath, he rejected the claims "as being anticipated by [the] Koehn [patent]." (PTO Rejection of 8/24/88, at 2.) He further rejected the claims regarding the visible markings on the sheath, deeming them "unpatentable over Koehn in view of Roehr." (*Id.*) "The use of markings on the proximal end of the insertion tube to indicate the bevel," he continued, "is conventional as demonstrated by Roehr." (*Id.* at 2–3.)

Again, plaintiff amended his claims. With respect to the sheath, he submitted: "Claim 15 has been amended to include 'a flexible catheter for use in the vascular system,' and that the sheath is a device having 'uniformly thin walled cylindrical shell tubular body portion' and further, that the sheath has a bore which is constructed to coact with and be supported by the flexible catheter within the sheath." (Pl.'s Resp. of 12/16/88, at 8.) This distinguished the claim from the prior art, plaintiff argued, because "the Koehn reference deals only with a catheter as formed on a [rigid] needle." (*Id.*) His invention, by contrast, uses a "flexible guide element," namely the catheter and guidewire, which "clearly distinguishes" it from Koehn. (*Id.*)

The patent was issued with plaintiff's amendments. *See* U.S. Patent No. 4,850,-960 (issued July 25, 1989) [hereinafter "'960 patent"].

### III. *The Instant Dispute and Claims at Issue*

On August 8, 2001, plaintiff filed this action, alleging that defendants' patented Angio–Seal vascular closure device infringes the '960 patent. The accused de-vice is used to seal punctures made in arteries during cardiovascular procedures. Plaintiff asserts that the Angio–Seal's newer models have beveled sheaths with markings, thereby infringing claims 13, 14, and 16 of his patent. The full language of the relevant claims is as follows:

13. ■ A sheath of a size for use in the vascular system for assisting in the insertion of other devices in blood vessels through the wall of the blood vessel, said sheath comprising:

■ a flexible catheter for use in the vascular system;

■ said sheath having a flexible uniformly thin walled cylindrical shell body portion having a bore therethrough and a distal end and a proximal end, said bore constructed to coact with and be supported by said flexible catheter extending within the bore;

■ a beveled tip portion formed on the distal end of said sheath, said beveled tip being formed at an acute angle with respect to the longitudinal axis of said tubular portion, to facilitate entry into an existing puncture in the wall of a blood vessel.

14. The device of claim 13 wherein visible indicia are provided along the length of the sheath to indicate the position of the tip of the beveled end.

16. The device of claim 1, 2, 3, or 13 further comprising indicia on said body portion to indicate the orientation of said bevel.

'960 patent, claims 13–14, 16.[5]

Defendants move for summary judgment, contending that, even assuming *arguendo* that plaintiff's proposed construction of these claims is correct, all three

---

**5.** For ease of description in its legal analysis, the Court has bracketed each "element" of claim 13.

claims are invalid in light of prior art. Plaintiff opposes the motion, asserting that there are genuine issues of material fact rendering summary judgment inappropriate.

### DISCUSSION

#### I. Summary Judgment Standard

A party is entitled to summary judgment when it demonstrates that there is no genuine issue of material fact and that the evidence establishes its entitlement to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir.1996). Once the movant has satisfied its initial burden, the opposing party must establish that a genuine factual issue exists. *Jersey Cent. Power & Light Co. v. Lacey Township,* 772 F.2d 1103, 1109 (3d. Cir.1985). The opposing party cannot rest on mere allegations and must instead present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 243, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Siegel Transfer, Inc. v. Carrier Express, Inc.,* 54 F.3d 1125, 1130–31 (3d Cir.1995); *Sound Ship Bldg. Corp. v. Bethlehem Steel Co.,* 533 F.2d 96, 99 (3d Cir. 1976), *cert. denied,* 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976). In considering a motion for summary judgment, the Court views all evidence in a light most favorable to the party opposing the motion. *Brewer v. Quaker State Oil Ref. Corp.,* 72 F.3d 326, 330 (3d Cir.1995).

#### II. Invalidity of Claims 13, 14, and 16 of the '960 Patent

■ There are two steps in determining patent invalidity *vel non.* First, the Court must construe the claims. *E.g., SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.,* 225 F.3d 1349, 1355 (Fed.Cir.2000). Second, having construed the claims, the Court must compare them to the prior art. *E.g., Helifix, Ltd. v. Blok–Lok, Ltd.,* 208 F.3d 1339, 1346 (Fed.Cir.2000).

##### A. Construction of Disputed Limitations of Claims [6]

■ Claim construction is a matter of law determined by the Court. *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 391, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). "In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to 'particularly point [ ] out and distinctly claim[ ] the subject matter which the patentee regards as his invention.'" *Interactive Gift Express, Inc. v. Compuserve, Inc.,* 256 F.3d 1323, 1331 (Fed.Cir.2001) (quoting 35 U.S.C. § 112). It is heavily presumed that those words

---

6. The Court recognizes that in a letter dated May 8, 2003, it expressed its opinion concerning the lack of need for a formal claim construction, reasoning that, for efficiency purposes and with the consent of defendants, it would adopt plaintiff's proposed construction for purposes of the instant motion. At that time, however, the Court was unaware of the Federal Circuit's holding in *Dana Corp. v. Am. Axle & Mfg., Inc.,* 279 F.3d 1372, 1375–76 (Fed.Cir.2002), which calls into question the procedural approach set forth in that letter. The Court was also unaware that there was a dispute concerning what plaintiff's proposed construction actually was—a dispute, incidentally, that is virtually as contested as the dispute over claim construction generally. As such, in the interests of comporting with *Dana* and of judicial economy, the Court shall construe the disputed claims. The disputed claims are few and simple enough to dispense with a formal *Markman* proceeding. *Cf. Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 981 (Fed.Cir.1995) (claim construction may be conducted "in the context of dispositive motions"), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

"mean what they say" and have the ordinary meaning to which persons skilled in the relevant art would attribute them. *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed.Cir.2002).

■ Dictionaries, encyclopedias, and treatises are particularly useful in determining the ordinary meaning of claim terms. *Id.* Such references, publicly available at the time the patent was issued, "are unbiased reflections of common understanding not influenced by expert testimony or events subsequent to the fixing of the intrinsic record by the grant of the patent, not colored by the motives of parties, and not inspired by litigation." *Id.* at 1203.

■ Also, the Court must consider the intrinsic record, such as the specification and prosecution history, in order to identify which of any alternative dictionary definitions is closest to the inventor's use of the term in question, or to determine whether the presumption of ordinary meaning has been rebutted. *Id.* at 1203–04. In the event the ordinary meaning can be ascertained from all these sources—namely, dictionaries, encyclopedias, treatises, and the intrinsic record—resort to extrinsic evidence, such as expert testimony, is improper. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir.1996).

Guided by these principles, the Court now turns to the disputed claim terms.

1. "A Sheath"

■ The central dispute surrounding the claim term "sheath" in element [1] of claim 13 is whether the sheath described has a particular size range. Plaintiff contends that, because the preamble to claim 13 states that the sheath is "of a size for use in the vascular system for assisting in the insertion of other devices in blood vessels through the wall of the blood vessel," the term "sheath" is limited to a known size range fit for accessing the vascular system by the percutaneous method. (Pl.'s Markman Br. at 21–22.) Citing to a medical textbook, published shortly before plaintiff's patent was issued, plaintiff suggests that this range was "fairly limited," with available sheath sizes ranging from 5 French to 9 French. (*Id.* at 22.)

Plaintiff's proposed size limitation cannot be part of the ordinary meaning of the term. Even assuming that sheaths suitable for accessing the vascular system through the skin were available during the relevant time period only in a 5 French to 9 French range,[7] there is no basis in the intrinsic record for importing such a numerical limitation. The claim itself states simply that the sheath is "of a size for use in the vascular system." '960 patent, claim 13. Also, the specification makes no mention of any size limitation, and plaintiff has failed to cite to any such limitation in the prosecution history. Surely, plaintiff would not argue that if, say, a 10 French sheath for vascular use suddenly became "available" the day after his patent issued, the language of claim 13 would fail, by virtue of falling outside the 5–9 French range, to encompass that sheath.[8] Be-

7. The prior art suggests otherwise. For example, Dr. S. Murthy Tadavarthy and others, in an article published in 1984, describe a percutaneous technique for introduction of a filter into the vena cava (a vein, and thus part of the vascular system) which calls for a 24 French sheath. *See* S. Murthy Tadavarthy, M.D., Wilfrido Castaneda–Zuniga, M.D., Erich Salomonowitz, M.D., Gunnar Lund, M.D., Andrew Cragg, M.D., David Hunter, M.D., Carol Coleman, M.D., Kurt Amplatz, M.D., *Kimray–Greenfield Vena Cava Filter: Percutaneous Introduction*, Radiology, May 1984, at 525 [hereinafter "Tadavarthy"].

8. Indeed, plaintiff's own expert testified in his deposition that a 24 French beveled sheath

cause neither the claim language, the specification, nor the prosecution history include a specific numerical limitation, the Court shall not impose one. *See Invitrogen Corp. v. Biocrest Mfg.*, 327 F.3d 1364, 1371 (Fed.Cir.2003).

Stedman's Medical Dictionary 1280 (24th ed.1982), defines sheath, in relevant part, as "[a] specially designed tubular instrument through which special obturators or cutting instruments can be passed, or blood clots, tissue fragments, calculi, etc. can be passed." While the language of claim 13 is distinguished somewhat from this definition, in that the sheath described in the patent facilitates the insertion of different devices, the intrinsic record generally supports *Stedman's* definition. For example, the specification describes the sheath as a "thin-walled outer tubular member" through which devices may pass. '960 patent, col. 1:57–2:2. Likewise, in the prosecution history, plaintiff stated that the sheath's position in the lumen "allow[s] for entry of the various devices that will then be placed into the blood vessel." (Pl.'s Patent Application at 23.)

Consequently, "sheath" shall be construed as "any tubular member of any size that can be used for accessing the vascular system through the skin and through which other devices and elements can be passed."

### 2. "A Flexible Catheter for Use in the Vascular System"

■ The parties agree that the "flexible catheter" of element [2] of claim 13 is an introducing catheter. They disagree, however, as to whether the catheter has to be beveled. Plaintiff cites the plain language of the claim, which recites no such limitation. Citing *Texas Digital*, 308 F.3d 1193, plaintiff contends that consulting the intrinsic record, when the claim terms are clear and without limitation, violates Federal Circuit precedent. Defendants counter that, as set forth in the intrinsic record, the beveled tip of the introducing catheter is central to the invention itself.

While the Court agrees with defendants' argument that a beveled catheter is the core of the patent generally,[9] plaintiff's position is the correct one. Patent claims must "particularly point[ ] out and distinctly claim[ ] the subject matter which the applicant regards as his invention." 35 U.S.C. § 112. The *claim* language chosen by the patentee is therefore the central focus of this Court's construction. *See Compuserve*, 256 F.3d at 1331. Claim 13, the only independent claim upon which plaintiff bases this action, describes the catheter within the sheath simply as "a flexible catheter for use in the vascular system." '960 patent, claim 13. Thus, the invention therein claimed is the beveled sheath, not the beveled catheter, which is claimed elsewhere in the '960 patent. Assuming *arguendo* that the concept of a bevel is a bona fide invention, defendants' construction of claim 13 would entitle them and others, without cost, to the benefits of the beveled sheath so long as they avoided

would infringe the '960 patent. (Wilensky Dep. Tr. at 88:6–16.)

9. The specification unequivocally states not only that the catheter is beveled, but that its bevel constitutes *the* improvement over the prior art and is indeed (along with the beveled sheath) the invention itself. *See* '960 patent, col. 1:1–11 (defining field of invention as relating "specifically" to a beveled-tip catheter); 2:32–38 (describing prior art of introducing catheters as "exclusively ... ending in a tip cut off at a right angle to the longitudinal axis of the catheter"); 2:62–68 (summarizing object of the invention as to "overcome the problems" of the blunt tip); 6:21–27 (same).

also beveling the introducing catheter.[10] Such a construction clearly contravenes the plain language of the claim and would encourage a take-what-portions-of-the-invention-you-like-and-leave-the-rest. approach to patent law by would-be infringers. *Cf. Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 94 L.Ed. 1097 (1950) (describing doctrine of equivalents and reasoning that "[o]ne who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal and shelter the piracy").

Moreover, plaintiff arguably contemplated the use of a single bevel, as the specification carefully holds at least two of the invention's objects to be "an introducing catheter *and/or* sheath having a beveled tip surface which is formed in either a planar or a concave configuration . . . [and] in which the end of the bevel rearmost from the tip is chamfered to provide a smoother surface for introduction into the body." '960 patent, col. 3:20–26 (emphasis added). While beveling only the sheath would clearly not constitute the preferred embodiment of the invention, it is understandable (and supported by the claim language and specification) that plaintiff would consider such use as part of his invention.

Accordingly, "flexible catheter" shall be construed as "a flexible, introducing catheter for use in the vascular system."[11]

### 3. A "Flexible" Sheath

■ The parties dispute the required flexibility of the sheath as described in element [3] of claim 13. Plaintiff maintains that the term "flexible" in this context means "not only that the sheath body portion is able to bend and follow the path of a guidewire into an existing puncture, but that it also is so flexible that it must be carried into the existing puncture by the introducing catheter." (Pl.'s Markman Br. at 24.) Defendants counter that "flexible" has an ordinary meaning, and that the there is nothing in the specification or prosecution history to warrant a different construction.

Plaintiff's proposed construction is without merit. There is absolutely no basis in the claim itself, the specification, or the prosecution history to justify a requirement that the sheath is so flexible that it cannot enter a vein on its own. Nevertheless, the Court only partially agrees with defendants. As with the construction of "sheath" above, the term "flexible" must be read in context of the language of the claim. *Compuserve*, 256 F.3d at 1331. Claim 13 concerns a "sheath . . . for use in the vascular system . . . having a flexible body portion [and] a bore therethrough . . . constructed to coact with and be supported by" the introducing catheter. '960 patent, claim 13. Therefore, the sheath need only be flexible enough to serve the purposes set forth in the claim at large. *See Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve, Inc.*, 796 F.2d 443, 450 (Fed.Cir.1986) (holding that the term "smooth," in light of the intrinsic record, "means smooth enough to serve the inventor's purpose"), *cert. denied*, 484 U.S. 823, 108 S.Ct. 85, 98 L.Ed.2d 47 (1987).

---

**10.** Given that defendants question the very existence of the "popping through" problem addressed by plaintiff's patent (Defs.' Markman Br. at 6) it is not inconceivable that they would use a beveled sheath and not a beveled catheter. Also, defendants' opinion that a patented bevel is neither novel nor necessary to reduce trauma does not entitle them to infringe that patent.

**11.** The term "flexible" will be accorded the same meaning as that used to describe the sheath in element [3], set forth below.

Consequently, "flexible" in the context of the sheath shall be construed as "flexible enough for use in the vascular system as a conduit for an introducing catheter and other devices."

4. "Uniformly Thin–Walled"

 The parties disagree on two points concerning the term "uniformly thin-walled" in element [3] of claim 13. The first issue is, in essence, whether the term "uniform" really means "uniform." Plaintiff contends that the term means only that the entire sheath must be thin-walled, not that it must have the exact same thickness throughout its length. Defendants call this position "a remarkable *tour de force* of illogic." (Defs.' Markman Br. at 25.) The term "uniform," they contend, is unambiguous, and in any event the intrinsic record reinforces the plain meaning of the word.

Defendants are correct. "Uniform" means "always the same" or "unvarying." American Heritage Dictionary 1321 (2d College ed.). Had plaintiff truly intended to advance the "thin-walled-but-not-necess arily-having-the-exact-same-thickness-throughout" construction of his sheath that he now embraces, he certainly would not have included the term "uniform" in his claim. *See Wright Med. Tech. v. Osteonics Corp.*, 122 F.3d 1440, 1444 (Fed.Cir.1997) (rejecting plaintiff's attempt to "eviscerate" a claim term). Examination of the intrinsic record is not necessary in this instance, but defendants are correct in their assertion that it squares with the ordinary meaning of the term "uniform." *See* '960 patent, col. 9:52–55; (Pl.'s Resp. of 12/16/88, at 8).

Accordingly, "uniformly" shall be construed as "unvaryingly."

The second dispute is over just how thin a "thin-walled" sheath really is. Plaintiff, citing his expert's report, proposes a numerical upward limit of two one-hun-dredths of an inch. (Pl.'s Markman Br. at 26 n. 30.) For the reasons set forth above in the Court's rejection of a numerical range for the sheath's size, plaintiff's argument lacks merit.

Consequently, "thin-walled" shall be construed as "wall thickness of a measure sufficient to allow the sheath to act as a conduit for the insertion of an introducing catheter or other devices used in accessing the vascular system through the skin."

5. "Beveled Tip Portion ... Formed at an Acute Angle ... to Facilitate Entry"

 The only apparent dispute over element [4] of claim 13 is the severity of the "acute angle." Plaintiff, citing his expert, suggests that "a person of ordinary skill would understand a beveled tip portion that facilitates entry to mean an angled surface of about 60 [degrees] or less." (Pl.'s Markman Br. at 28 n. 35.) Defendants argue that importing a numerical limitation runs counter to precedent, and that the prosecution history suggests merely a preference for the angle of the cut—one of 30 degrees, not 60.

Defendants are correct. The "beveled tip" language of the claim does not warrant importation of a numerical limitation. To the contrary, it implies that, so long as the tip "facilitate[s] entry," the angle is acute enough. The medical definition of "bevel" available during the period supports this plain language interpretation: "A surface having a sloped or slanting edge." *Stedman's*, at 168.

Given the purpose of the invention, *see, e.g.*, '960 patent, col. 2:62–68, it can be inferred that any bevel, so long as it renders entry significantly easier than it would have been with a blunt tip, is encom-

passed by the claim.[12] Moreover, the specification states that, "[w]ith respect to the longitudinal axis of the catheter, the bevel 15 should be cut at an angle as acute as possible, *preferably* 30 [degrees] or less." '960 patent, col. 6:38–40 (emphasis added). This raises two problems for plaintiff. First, it is indicative of the fact that the term "beveled tip" has only a preferred embodiment, rather than one justifying numerical limitation of the claim. *See Texas Digital*, 308 F.3d at 1204–05. Second, it calls into question the assertion by plaintiff's expert that 60 degrees is the outer limit of "acuteness," which appears arbitrary in light of this significantly more acute preferred embodiment. In any event, there is no basis in the intrinsic record for such a limitation. *See Invitrogen*, 327 F.3d at 1371.

Accordingly, "beveled tip portion" shall be construed as "a sloped edge rendering entry into a vein palpably easier than it would have been with a blunt edge."

6. "Visible Indicia ... Along the Length of the Sheath to Indicate the Position of the Tip of the Beveled End"

■ Plaintiff contends that, with respect to claim 14, "[t]he term 'position' is not limited to an indication of the depth of penetration of the tip or to information about the rotation of the tip." (Pl.'s Markman Br. at 29.) To the contrary, the term *is* so limited. In addition to the plain language of the claim, which relates to the "tip of the beveled end," plaintiff's response to the PTO's Official Action stated: "Specifically, the claims of the present invention require that the indicia extend from the beveled tip portion backward."

(Pl.'s Resp. of 5/25/88, at 12.) Plaintiff shall be held to this representation.

Consequently, "visible indicia ... to indicate the position of the tip" shall be construed as "visible indicia extending from the beveled tip portion to indicate the catheter's position in the vein."

B. *Comparison of Claims to Prior Art*

■ A patent is invalid if it has been "anticipated" by prior art. *See* 35 U.S.C. § 102. More specifically, a person is not entitled to a patent if his invention was either described in a publication or in public use more than one year prior to the filing of the application. § 102(b). "To anticipate a claim, a prior art reference must disclose every limitation of the claimed invention, either explicitly or inherently." *In re Schreiber*, 128 F.3d 1473, 1477 (Fed. Cir.1997).

■ A patent is also invalid if the invention is "obvious" to one of ordinary skill in the subject matter. *See* 35 U.S.C. § 103(a). In determining obviousness, the Court looks at "the scope and content of the prior art," "differences between the prior art and the claims at issue," "and the level of ordinary skill in the pertinent art." *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). There must be "a suggestion, teaching, or motivation to combine the prior art references." *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1125–25 (Fed.Cir.2000).

1. Claim 13

■ There is no triable fact for the jury with respect to claim 13 of the '960

---

12. The Court disagrees with defendants insofar as they contend that *any* acute angle would suffice. Clearly, an angle of, say, 89 degrees would fail to comport with the spirit of the supposed invention and would probably create the same undesirable effect as a blunt tip. The bevel must "facilitate entry" into the vein.

patent. As set forth below, it is anticipated by the prior art.

a. *Dotter Video*

In 1969, Dr. Charles T. Dotter and others produced a video that described the process of transluminal angioplasty. *See* Videotape: Transluminal Angioplasty (Guttman Inst. for Vascular Research Through Radiology 1969) (on file with Univ. of Oregon Med. School) [hereinafter "Dotter"]. The video portrays a man in pain as a result of "a sharp localized narrowing in the left superficial femoral artery." Dotter, at 1:55.[13] Transluminal angioplasty, the narrator explains, is an attractive alternative to vascular surgery, which could remove or bypass the problem. Dotter, at 2:05. The process involves the employ of what certainly appears to be the modified Seldinger method,[14] and the narrator describes the necessary supplies as follows:

> A low-cost disposable catheter dilating set is commercially available. This contains a coil spring guide, a number 8 inner catheter or radiopaque Teflon, [and] a number 12 outer dilating catheter. These go together coaxially. *Catheter tips are cut at an angle to facilitate entry and minimize plowing.*

Dotter, at 2:54 (emphasis added).

Every limitation of claim 13 is taught by this video. First, the sheath displayed therein is unquestionably covered by the Court's construction of that term in element [1] of claim 13, namely, a "tubular member of any size that can be used for accessing the vascular system through the skin and through which other devices and elements can be passed." As the video demonstrates, a sheath is inserted percutaneously into a femoral artery, the very blood vessel plaintiff cited in his claim construction chart as an example of "part of the superficial vascular system that is directly accessible by the percutaneous method." (Pl.'s Revised Preliminary Claim Construction Chart at 2.) The sheath in the video is then used as a conduit for needles and fluid injections. Dotter, at 5:35.

Second, the introducing catheter portrayed in the video is visibly flexible and inserted into the femoral artery. It is therefore encompassed within the Court's construction of element [2] of claim 13, which defined the flexible catheter as "a flexible, introducing catheter for use in the vascular system."

Third, the sheath in the video is indisputably "flexible enough for use in the vascular system as a conduit for an introducing catheter and other devices," because the demonstrated procedure uses the sheath in such a manner. Also, to the extent it is relevant, the walls of the sheath appear uniform, and they are certainly, as evidenced by the demonstration, thin-walled enough for percutaneous use in the vascular system. The video therefore teaches element [3] of claim 13.

---

13. The times in the video herein cited are based on the CD–ROM version provided by defendants, not the video itself, which appears to be two and one half minutes longer than the CD–ROM version.

14. The narrator describes "a Seldinger needle, pointed downstream," which the doctor inserts into the vein. When blood flow is effected, the narrator describes the doctor's actions: "In with the guide, and off with the needle.... Now we thread the guide through it.... Now, the smaller inner catheter goes in and is advanced over the guide and down through the narrowing.... Next, the large outer catheter is carefully put on over the first catheter, so as to avoid deforming its tip. It is then slid in, and with occasional rotation to avoid plowing, is forcibly pushed through the narrowed segment." Dotter, at 3:30.

478

Finally, element [4] of claim 13, concerning the "beveled tip portion," is also evident in the video. As the narrator clearly states, "[c]atheter tips are cut at an angle to facilitate entry and minimize plowing." Dotter, at 2:54. In so stating, the narrator sets forth both the definition of element [4], namely, "a sloped edge rendering entry into a vein palpably easier than it would have been with a blunt edge," and, in essence, the core of plaintiff's invention.

The Dotter video teaches claim 13 of plaintiff's patent. As a consequence, claim 13 of the '960 patent is anticipated under § 102 and thus invalid.

b. *Tadavarthy Article*

As discussed *supra*, Dr. Tadavarthy and others published an article in 1984 describing a percutaneous technique for introduction of a filter into the vena cava. *See* Tadavarthy, at 525. The article reveals a guidewire, an 8 French dilator, a 24 French dilator, and a Teflon sheath, all going together coaxially and entering the vena cava through the skin. *Id.* The sheath covering the wire and catheters is clearly beveled. *Id.*

The Tadavarthy article teaches plaintiff's invention. First, the sheath pictured in the article's diagram is clearly a "tubular member ... used for accessing the vascular system through the skin and through which other devices ... can be passed," and it is obviously "thin-walled" and "flexible enough for use in the vascular system." As the very title of the article demonstrates, this sheath is being inserted percutaneously into the vena cava.[15] *Id.* A device, specifically a so-called "Greenfield filter," is passed through the

sheath following removal of the introducing catheters. *Id.* at 526. Elements [1] and [3] of claim 13 are thus taught.

Second, the article shows an introducing catheter that visibly bends and is inserted into the vena cava, thus rendering it, by definition, flexible enough for use in the vascular system. Element [2] is therefore satisfied. Plaintiff's argument that the article's addition of a third catheter to the procedure somehow distinguishes the prior art from his invention is rejected. The law is clear: immaterial deviations from the core design will not constitute new inventions or non-infringing uses. *See Markman*, 517 U.S. at 373–74 n. 1, 116 S.Ct. 1384. The introduction of an additional dilator does nothing to alter that which plaintiff purports to have invented, namely a beveled sheath. If Dr. Tadavarthy had published this article and used a beveled sheath *after* plaintiff's patent issued, and in the absence of other invalidating art, the technique described in the article would infringe, because it would "go to 'the heart of an invention but avoid[ ] the literal language of the claim by making a noncritical change.'" *Id.* (internal citation omitted). As it was published three years before issuance of the '960 patent, it instead anticipates. *Cf. Peters v. Active Mfg. Co.*, 129 U.S. 530, 537, 9 S.Ct. 389, 32 L.Ed. 738 (1889) ("That which infringes, if later, would anticipate, if earlier.").

Finally, the article clearly reveals a sheath with a "sloped edge" that would facilitate vein entry. Accordingly, element [4] of claim 13 is covered.

Because the Tadavarthy article teaches every element of claim 13, it invalidates the '960 patent under § 102.[16]

15. The inferior vena cava, shown in the diagram, is "a major vein draining all of the body below the level of the respiratory diaphragm." Churchill's Medical Dictionary

2063 (1989). It is therefore part of the vascular system.

16. An article published in the British Heart Journal in 1969 by C.W. Vellani and others

#### 2. Claims 14 and 16

██ Claims 14 and 16, respectively, claim the subject matter of sheath markings that indicate both the depth and orientation of the sheath in the vein.[17] By virtue of referencing claim 13, claims 14 and 16 are "dependent" claims. *See* 35 U.S.C. § 112.

The prosecution history of the '960 patent demonstrates that, had claim 13 been rejected as anticipated, claims 14 and 16 would have failed as well. Both claims were twice rejected, and plaintiff, rather than amending them, narrowed independent claim 13 to avoid the prior art cited by the PTO Examiner. Because a dependent claim, by definition, incorporates all the limitations of the independent claim plus a further limitation, *see* § 112, the PTO Examiner could not render claims 14 and 16 invalid after accepting plaintiff's amendment to claim 13. *See Hartness Int'l, Inc. v. Simplimatic Eng'g Co.*, 819 F.2d 1100, 1108 (Fed.Cir.1987). Now that claim 13 has been held invalid, the Court revisits the Examiner's concerns about the obviousness of markings on the sheath.

Defendants submit as evidence the 1987 patent of David Evans. *See* U.S. Patent No. 4,645,491 (issued February 24, 1987) [hereinafter "'491 patent"]. The Evans patent was cited by the PTO Examiner when he rejected plaintiff's first response.

(PTO Rejection of 1/22/88, at 4.) The patent reveals markings on a catheter, which is inserted through a needle having a window for viewing the markings as the catheter enters the body. The markings exist to ensure that "the leading end of the catheter [is] confined to a predetermined depth." '491 patent, col. 1:8–10, 1:44–56.

Defendants also submit the 1975 article of Drs. Swan and Ganz, wherein the latter describe visible markings on balloon flotation catheters. *See* H.J.C. Swan, William Ganz, "Use of Balloon Flotation Catheters in Critically Ill Patients," *Surgical Clinics of N. Am.* 55:501–20, June 1975. "The shafts of all catheters are marked to indicate 10 cm distances from the catheter tip," the article states, "[in order] to facilitate initial placement of the catheter . . . ." *Id.* at 504.

Defendants further cite to the 1984 patent of Peter Schiff. *See* U.S. Patent No. 4,473,067 (issued September 25, 1984) [hereinafter "'067 patent"]. The Schiff patent reveals an introducing sheath, used to facilitate percutaneous insertion of balloon catheters, with markings. Specifically, the specification states:

The introducer sheath is split by stages . . . until . . . the splitting reaches a marker band provided about the outer periphery of introducer sheath for indi-

---

also appears to invalidate claim 13 for the same reasons. *See* C.W. Vellani, G. Tildesley, and L.G. Davies, *Endocardial Pacing: A Percutaneous Method Using the Subclavian Vein*, British Heart Journal, 1969, vol. 31, at 106. It states, in relevant part:

Through a small stab incision *in the skin,* a needle . . . is directed medially . . . . *Entry into the vein* is often felt. A 50 cm. *Seldinger wire* 0.91 mm. in diameter is inserted through the needle and its presence in the *superior vena cava* confirmed by fluoroscopy. The needle is then replaced by a *composite dilator* [and] over this is mounted a shorter length of untapered polythene *tub-*

*ing . . . with one end beveled* so as to provide stepwise dilatation of the needle tract. This is advanced into the vein, and the guide wire and inner polyethylene tube are then removed leaving the outer cannula *in situ.* *Id.* (emphasis added).

17. Claim 14 states: "The device of claim 13 wherein visible indicia are provided along the length of the sheath to indicate the position of the tip of the beveled end." '960 patent, claim 14. Claim 16 states: "The device of claim 1, 2, 3, or 13 further comprising indicia on said body portion to indicate the orientation of said bevel." '960 patent, claim 16.

cating to the operator that the length of the percutaneous sheath between marker band and distal end is just adequate to enable the distal end portion to extend partially into the femoral artery . . . .

'067 patent, col. 7:60–68. The diagram therein provided clearly demonstrates a marking intended to indicate sheath depth. '067 patent, figure 5.

Defendants also submit the 1963 patent of Zbislaw M. Roehr. *See* U.S. Patent No. 3,093,134 (issued June 11, 1963) [hereinafter "'134 patent"]. The Roehr patent reveals visible indicia on a beveled needle to indicate the orientation of the needle in the vein. "A problem often faced by physicians in making hypodermic injections," the specification states, "is that it is necessary to determine the orientation of the needle bevel after the same has been inserted into the flesh. By making the plastic of transparent material (or even translucent) the physician can determine the orientation of the needle bevel by observing the corresponding orientation of the projection on the cannula[18] within the transparent or translucent hub." '134 patent, col. 1:58–65. In figures 14a and 14b, the patent illustrates "a pigmented bonding agent" that is "applied to the outer surface of the end of the cannula." '134 patent, col. 4:15–19. This "serves to indicate the orientation of the bevel end of the cannula . . . ." '134 patent, col. 4:19–23.

The PTO Examiner cited the Roehr patent in his initial rejection of all claims. "The feature of marking the leading point of the bevel," he stated, "is conventional as shown by Roehr." (PTO Rejection of 1/22/88, at 3.) When plaintiff narrowed the scope of his invention with respect to the beveled tip concept, the Examiner again cited Roehr in rejecting plaintiff's dependent claims: "Claim[ ] . . . 16[is] rejected under 35 U.S.C. 103 as being unpatentable over [the] Koehn [patent] in view of Roehr." (PTO Rejection of 8/22/88, at 2.) "The use of markings on the proximal end of the insertion tube to indicate the bevel," he continued, "is conventional as demonstrated by Roehr." (*Id.* at 2–3.) Rather than attempting to overcome Roehr, plaintiff narrowed the independent claim in order to overcome Koehn. (*See* Pl.'s Resp. Of 12/16/88, at 8.) The patent was then issued.

Finally, defendants cite to the 1982 patent of John Feller, Jr. *See* U.S. Patent No. 4,362,156 (issued December, 7 1982) [hereinafter "'156 patent"]. The Feller patent reveals a "flexible, winged, over-the-needle catheter assembly." '156 patent, abstract. In order to ensure that the beveled end of the needle is facing up, the patent teaches that the "alignment of the beveled surface is indicated by marking the catheter wings." '156 patent, col. 4:33–42.

With this evidence, defendants have clearly satisfied their initial burden, which now shifts to plaintiff, who must present actual evidence that a triable fact exists. *See Lacey Township*, 772 F.2d at 1109; *Siegel Transfer*, 54 F.3d at 1130–31. In opposition, plaintiff submits three pieces of evidence. First, he cites the absence of visible indicia in a 1987 article by Dr. Wilfrido Castaneda–Zuniga, who is one of defendants' witnesses in this action; second, he cites his expert's opinion that the dependent claims were not obvious; and third, through his expert's declaration, he cites the commercial success of the Angio Seal. (Pl.'s Br. at 28–29.)

Plaintiff's submissions amount to a mere "scintilla of evidence" and cannot therefore be countenanced for purposes of this mo-

---

**18.** A "cannula" is "[a] semirigid or rigid plastic or metal tube inserted into the lumen of a vessel, duct, or cavity." Churchill's Medical Dictionary 285 (1989).

tion. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. The absence of visible indicia on the beveled sheath in the Castaneda article has little if any probative value. The article was briefly describing improvements in a dilator system for extracting stones, said improvements involving an increase in the size of stone that could be extracted, not catheter depth and the like. *See* Rusnak, et al., *An Improved Dilator System for Percutaneous Nephrostomies,* Radiology, July 1982, at 174. An omission of a certain immaterial detail does not *ipso facto* render that detail non-obvious.

Likewise, plaintiff's expert's opinion of non-obviousness has little value. Indeed, the opinion relies solely on an assessment of the shorter length of vascular access sheaths as compared to the prior art. (Eckmann Rebuttal Expert Report ¶ 90.) This constitutes, as far as the Court can tell, the first time the issue of sheath length, as opposed to thickness, has been raised. It moreover contradicts plaintiff's submission to the PTO Examiner, where, in order to distinguish his invention from the Koehn patent, he stated: "[T]he catheter of Koehn is not intended to reside deep within a vein or artery as would be with the introducing catheter of the present invention which is intended to act in coaction with a flexible guide wire." (Pl.'s Resp. of 12/16/88, at 7.) Based on its construction of the term "sheath" above, as well as the prosecution history posture of the applicant, the Court rejects plaintiff's attempt to inject the issue of sheath length solely to create a factual issue. There is no such limitation on the claim, and the Court declines to construe it further.

Finally, plaintiff has submitted no evidence concerning the commercial success of the Angio Seal, particularly with respect to whether that success can be attributed (at all) to sheath markings. Plaintiff's and his expert's assertions are wholly conclusory and thus rejected. *See Siegel Transfer,* 54 F.3d at 1130–31.

There is no genuine issue as to a material fact concerning claims 14 and 16. The prior art overwhelmingly reveals visible indicia on beveled needles, catheters, *and* sheaths, all of which are used percutaneously in the art. The art is thus broad in scope, and its similarities to plaintiff's invention are stark. *See Graham,* 383 U.S. at 17, 86 S.Ct. 684. Also, given the nature of the problem addressed by the visible indicia, namely determining depth and orientation of a catheter or sheath once it enters a vein, practitioners would have been motivated to look to references that may contain solutions. *See Pro–Mold & Tool Co. v. Great Lakes Plastics, Inc.,* 75 F.3d 1568, 1573 (Fed.Cir.1996). Even more likely, most practitioners, in the course of their careers, would have seen such indicia either on a needle, *see* '134 patent, a catheter, *see* '491 patent, or a sheath, *see* '067 patent.

For these reasons, claims 14 and 16 of the '960 patent are invalid under 35 U.S.C. § 103.

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment [79] is GRANTED. This action is hereby dismissed and the remaining motions are now MOOT.

SO ORDERED.