Charles WILLIAMS, Appellee,

v.

Michael GUZZARDI and Chancellor Associates, Appellants.

No. 88–1492.

United States Court of Appeals, Third Circuit.

Argued Dec. 12, 1988.

Decided May 15, 1989.

Michael S. Bomstein (argued), Pinnola & Bomstein, Philadelphia, Pa., for appellants.

Frederick C. Timm (argued), Philadelphia, Pa., for appellee.

Before GIBBONS, Chief Judge, HUTCHINSON and ROSENN, Circuit Judges.

## OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

Charles Williams brought this action for damages in the United States District Court for the Eastern District of Pennsylvania against his former landlord, Chancellor Associates (Chancellor), and its employee, Michael Guzzardi. He asserted claims under 42 U.S.C.A. §§ 1981, 1982 (West 1981), 42 U.S.C.A. § 3612 (West 1977) and Pennsylvania law, all stemming from his April, 1986 eviction from the Chancellor Apartments in Philadelphia, Pennsylvania. After a four-day trial, the jury awarded Williams $25,000 in compensatory and punitive damages on his claim for intentional infliction of severe emotional distress.[1] The district court thereafter dismissed the defendants' motion for judgment notwithstanding the verdict or a new trial because of their failure to order the trial transcript or otherwise comply with Local Rule 20(e).

Guzzardi and Chancellor now appeal. They do not argue that the district court improperly dismissed their post-trial motion and have therefore waived that issue. Instead, they argue only that the district court should have entered judgment in their favor because Pennsylvania does not impose liability for intentional infliction of severe emotional distress or, alternatively, that the evidence before the jury was insufficient to establish that tort. Although appellants' notice of appeal specifies only the order dismissing their post-trial motion, we conclude it also brings before us the order entering judgment for Williams and the underlying denial of appellants' directed verdict motion at the close of the evidence. Upon careful consideration of the applica-

ble Pennsylvania law, we continue to believe that Pennsylvania will recognize this tort and that the evidence in this record was sufficient to establish liability for it. Accordingly, we will affirm the district court's entry of judgment on the jury's verdict.

### I.

Williams moved into the Chancellor Apartments in March, 1986. After he wrote two bad checks for the April rent, the management informed him that it was considering legal action. Williams then asked to meet with Guzzardi. Williams testified that on April 24, 1986 they had a heated conversation at his apartment during which Guzzardi said "he could very easily throw me out the window" and "could take care of [me] without ever laying a hand on [me] because [he knew] people." Appendix (App.) at 1–89. Later that day, a maintenance man removed the door to Williams's apartment and replaced it several hours later.

The following day, Guzzardi asked Williams for some assurance that he would pay the rent due. Guzzardi suggested that Williams relinquish his apartment keys, stay overnight at a Holiday Inn at the apartment's expense and re-occupy his apartment the next day after paying what he owed. *Id.* at 1–93. Williams testified that he accepted this suggestion to show his sincerity. After Williams gave his keys to the doorman, Guzzardi "said something to the effect: 'Well, how do you like it? I got you. I told you I was going to get you back. Nobody talks to me like you did.'" *Id.* at 1–94. Guzzardi then told passing police officers that Williams was a trespasser and did not live in the building. Unable to refute this assertion, Williams left.

Williams stored the bag of clothes he had intended to take to the Holiday Inn in a locker at the bus station and "basically just walked, trying to think of, you know, some

---

1. The jury also found for Williams on his claim for slander, but awarded no damages. The remaining claims were resolved against him. The only issues on appeal concern the claim for intentional infliction of severe emotional distress.

way of rectifying the problem of where to stay that night." *Id.* at 1–97. On succeeding nights, he slept at a friend's residence, in Fairmount Park, underneath the Suburban Station, and on the concourse of City Hall. *Id.* at 1–97 to –98. During this time, Williams testified, he "had just a very low feeling," felt "like a non-entity almost," and was "dissolusioned [sic] and depressed over my sudden state." *Id.* at 1–98. He described the experience as "totally bewildering and unpleasant." *Id.* at 1–99. After three weeks, he found "a stable place to stay" at the Adelphia House, in the offices of a local politician for whom he had done volunteer work. *Id.* at 1–99 to –100.

On May 20, 1986, Williams served as a poll watcher at the Chancellor Apartments for the primary election. Guzzardi asked him why he was there and "then announced, 'Watch this guy. He's a pimp. I kicked him out of here for running a whore house.' " *Id.* at 1–101; *see also id.* at 1–40. Later that day, Guzzardi told Williams to take the rest of his belongings with him when he left "or we're going to throw them out on the street," *id.* at 1–104. On Guzzardi's instructions, the doorman carried them to the street. Williams took what he could carry to the Adelphia House and a passing friend, recognizing the items as Williams's, took the rest. *Id.* at 1–105 to –106.[2]

Williams testified that as a result of all these events his feelings of helplessness returned. His freedom to perform ordinary tasks was limited. *Id.* at 1–107. His mail and telephone correspondence was disrupted and he did not receive a check until at least six to eight weeks after it was expected. *Id.* at 1–107 to –108. He said this was "a very frustrating existence.... I was very, very depressed, and it seemed that things that I normally coped with very easily became difficult tasks." *Id.* at 1–109.

In November, 1986, Williams consulted Dr. Peg Van Vyven, a psychotherapist. *Id.*

at 1–110. Dr. Van Vyven, testifying as an expert in psychology, stated that when she first saw Williams he had difficulty concentrating, lacked motivation, and "felt like he ha[d] lost control over his life." *Id.* at 2–7. He was also distraught, *id.* at 2–9, and was having difficulty sleeping "to a large extent." *Id.* at 2–12. She initially diagnosed him as suffering from an "adjustment disorder" but soon "changed the diagnosis to a depressive disorder." *Id.* at 2–7. She testified that "[t]he symptomology of a depressive disorder is more debilitating to the individual" than the symptomology of an adjustment disorder. *Id.* at 2–8. Williams's "severe set of depressive symptoms" included embarrassment and humiliation, and he had great difficulty asking for help. *Id.* at 2–9 to –10.

In August, 1987, she referred Williams to Dr. Grosso, who prescribed antidepressant medication. *Id.* at 1–112, 2–10 to –11. Dr. Van Vyven subsequently saw improvement in Williams's condition. *Id.* at 2–19. Williams testified that before the eviction, he had neither sought psychotherapy nor taken medication for an emotional or mental condition. *Id.* at 1–113 to –114.

Dr. Van Vyven gave a professional opinion that if Williams was illegally evicted, without notice or opportunity to remove belongings, and was left without a place to stay, it would be "a cause or a substantial cause of his condition." *Id.* at 2–13.[3] She testified that being falsely accused of being a pimp would also have been a substantial contributing cause. According to Dr. Van Vyven, the eviction "symbolized to him that he had no control over what happened to his life," *id.* at 2–22, and "[a]ll of the events would have left him with a lack of [a] sense of control over what happened to him in his life, and that is one of the main definitions of the beginning of depression." *Id.* at 2–14.

Dr. Van Vyven admitted that Williams had not informed her that he had previously consulted a doctor for sleeplessness and

---

2. Williams claimed he did not recover a rug, telephone, sports equipment, radio, assorted clothes, and other items he had left in his apartment. *Id.* at 1–106.

3. Dr. Van Vyven later explained that whether Williams perceived the eviction as illegal was significant, *id.* at 2–26 to –29, not whether it actually was.

had taken medication for this ailment. She acknowledged that this might indicate a pre-existing depressive disorder and that Williams's earlier eviction from a different apartment could have been traumatic. Nevertheless, she stated that while these facts might "affect the precipitating cause [of Williams's disorder] ... an illegal eviction and a subsequent experience that he had would still have exaggerated it or made it worse." *Id.* at 2–30.

## II.

Federal Rule of Appellate Procedure 3(c) requires a notice of appeal "designate the judgment, order or part thereof appealed from." Appellants' notice of appeal specifies only the district court's order dismissing their post-trial motion. *Id.* at A–513. The parties, however, do not argue the propriety of the dismissal, but focus instead on the sufficiency of the evidence to support the verdict. We first consider whether the failure of the notice of appeal to specify an order ruling on the sufficiency of the evidence precludes us from considering appellants' arguments. *See Terket v. Lund,* 623 F.2d 29, 32 (7th Cir.1980) (court must consider *sua sponte* question of appellate jurisdiction over order not specified in notice of appeal).

The specification of the order dismissing the motion for judgment n.o.v. or a new trial does not bring up the merits of that motion. *See Frangos v. Doering Equip. Corp.,* 860 F.2d 70, 73 n. 4 (3d Cir.1988). However, "if from the notice of appeal itself and the subsequent proceedings on appeal it appears that the appeal was intended to have been taken from an unspecified judgment[,] order or part thereof, the notice may be construed as bringing up the unspecified order for review." *Elfman Motors, Inc. v. Chrysler Corp.,* 567 F.2d 1252, 1254 (3d Cir.1977) (per curiam).[4] We have appellate jurisdiction over orders not specified in the notice of appeal if there is a connection between the specified and unspecified order, the intention to appeal the unspecified order is apparent and the opposing party is not prejudiced and has a full opportunity to brief the issues. *See Murray v. Commercial Union Ins. Co.,* 782 F.2d 432, 434–35 (3d Cir.1986) (appellate jurisdiction over unspecified prior order dismissing two of three counts where notice of appeal specified order granting summary judgment on remaining count, parties briefed all issues and earlier dismissals could not be appealed until final judgment entered); *Gooding v. Warner–Lambert Co.,* 744 F.2d 354, 357 n. 4 (3d Cir. 1984) (appellate jurisdiction over unspecified prior order dismissing one claim where notice of appeal specified order granting summary judgment on remaining claim, dismissal could not be appealed until judgment entered on other claim, and parties briefed and argued all issues); *see also Foman v. Davis,* 371 U.S. 178, 181, 83 S.Ct. 227, 229, 9 L.Ed.2d 222 (1962) (where notice of appeal from denial of motion to vacate judgment and amend complaint did not specify prior judgment dismissing complaint, but premature notice of appeal specified judgment of dismissal and parties briefed and argued merits of dismissal, court had jurisdiction over earlier judgment since intent to appeal from it was manifest and respondent was not misled or prejudiced).[5]

---

4. This principle cannot be stretched to create appellate jurisdiction over entirely collateral orders first raised in supplemental briefing. *See, United States v. Rivera Constr. Co.,* 863 F.2d 293, 298–99 (3d Cir.1988) (in appeal from conviction for conspiracy to defraud government, no jurisdiction over unspecified order appointing corporate receiver).

5. Other circuits apply a similar test. *Meehan v. County of Los Angeles,* 856 F.2d 102, 105 (9th Cir.1988) (determine intention to appeal from unspecified order by looking at " 'first, whether the affected party had notice of the issue on appeal; and, second, whether the affected party had an opportunity to fully brief the issue' " (quoting *Lynn v. Sheet Metal Workers' Int'l Ass'n,* 804 F.2d 1472, 1481 (9th Cir.1986), *aff'd,* — U.S. —, 109 S.Ct. 639, 102 L.Ed.2d 700 (1989))); *Simpson v. Norwesco, Inc.,* 583 F.2d 1007, 1009 & n. 2 (8th Cir.1978) (notice of appeal which referred only to order denying motion for judgment n.o.v. or new trial treated as appeal from entry of judgment because appellee had sufficient notice that the decision would be appealed and was not prejudiced).

All those factors are present here. The appellants properly moved for a directed verdict, a prerequisite for a judgment n.o.v. motion. *See* Fed.R.Civ.P. 50(a), (b). The denial of their directed verdict motion underlies the final order dismissing their post-trial motion and the order entering judgment against them. Although the parties do not tie their arguments to the directed verdict motion, they have fully briefed the sufficiency issue which determines whether that motion should have been granted. We therefore have appellate jurisdiction over the denial of the appellants' directed verdict motion. *See Frangos*, 860 F.2d at 73 (although post-trial motion properly dismissed, court could review denial of directed verdict motion in appeal from judgment entered on verdict).[6]

Our scope of review over that order is plenary. More specifically, " '[w]e must determine whether, as a matter of law, the record is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief.... [I]f the evidence is of such character that reasonable men, in the impartial exercise of their judgment may reach different conclusions, the case should be submitted to the jury.' " *Link v. Mercedes–Benz of North America, Inc.*, 788 F.2d 918, 921 (3d Cir. 1986) (quoting *Patzig v. O'Neil*, 577 F.2d 841, 846 (3d Cir.1978)).

### III.

 At the threshold, appellants contend that Pennsylvania does not recognize any liability for intentional infliction of severe emotional distress. We do not agree. Pennsylvania has been critical of the Restatement formulation of this tort and has otherwise evidenced a restrictive view of it. Nevertheless, we believe it continues to exist in Pennsylvania.[7]

In *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1273 (3d Cir.1979) (in banc), we noted that although the Supreme Court of Pennsylvania "has not as yet specifically adopted in its entirety the Restatement's formulation and comments, Pennsylvania courts have signaled their acceptance of this evolving tort." We went on to say that "the black letter rule of § 46 of the Restatement, along with the interpretive comments, may be applied as the basis in Pennsylvania law for the tort of intentional infliction of emotional distress." *Id.* at 1274.

Appellants argue that the later decision in *Kazatsky v. King David Memorial Park, Inc.*, 515 Pa. 183, 527 A.2d 988 (1987), shows that this prediction was wrong and that Pennsylvania does not yet recognize the tort.[8] In *Kazatsky*, the Supreme Court of Pennsylvania held that the evidence did not establish a cause of action under § 46 and left "to another day the question of the viability of section 46 in this Commonwealth." *Id.* at 185, 527 A.2d at 989. It stated that "if section 46 of the Restatement is to be accepted in this Commonwealth, at the very least, existence of

---

**6.** Appellants' failure to properly pursue their judgment n.o.v. motion limits the relief we may grant to a new trial. *See Johnson v. New York, N.H. & H.R. Co.*, 344 U.S. 48, 54, 73 S.Ct. 125, 128, 97 L.Ed. 77 (1952) (where party whose directed verdict motion should have been granted made post-trial motion to set aside verdict or for new trial, but not for judgment n.o.v., relief limited to new trial); *Woods v. National Life Ins. Co.*, 347 F.2d 760, 769 (3d Cir.1965) (after granting new trial on other grounds, noting that failure to file judgment n.o.v. motion precluded determination of whether party entitled to directed verdict); *Woods*, 347 F.2d at 772 (Foman, J., concurring) (if evidence had not been improperly excluded appellant would have been entitled to a directed verdict, but "agree[ing] that a failure to move for a judgment n.o.v. will neither permit an appellate court nor a trial court to enter a judgment notwithstanding the

verdict, and on this ground we must remand this case for a new trial").

**7.** Section 46 of the Restatement (Second) of Torts (1965) states:

One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

**8.** In *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 394–96 (3d Cir.1988), decided after *Kazatsky*, we assumed the continuing existence of this tort in Pennsylvania without citation to or discussion of *Kazatsky*, but affirmed a directed verdict for defendant employer on the ground that its conduct, while intentional, was not outrageous.

the alleged emotional distress must be supported by competent medical evidence," *id.* at 197, 527 A.2d at 995, and found the lack of such evidence precluded recovery. *Id.* at 197–98, 527 A.2d at 995.

This evidential burden seems intended to substitute for other restrictions courts once imposed on juries faced with claims of emotional harm. Thus, after tracing the gradual relaxation of limitations on a bystander's recovery for emotional distress, the *Kazatsky* court observed that "[w]hile concerns over proof of causation were found to be unjustified in the area of bystander recovery for emotional distress, the same cannot be said of the tort defined by section 46." *Id.* at 194, 527 A.2d at 993.[9] To prevent damages from being inferred from the defendant's conduct alone, the court required some "objective proof of severe emotional distress" and determined that this would "not present an insurmountable obstacle to recovery." *Id.*[10]

Given *Kazatsky*'s express reservation of the viability of § 46 and the court's specification of the evidence necessary to prove that kind of injury, we are unable to say that Pennsylvania will not impose liability for intentional infliction of emotional distress. *See id.* at 198, 527 A.2d at 995 (Larsen, J., concurring) (to measure conduct against standards of § 46 and to establish type of evidence needed to prove injury under § 46 is to adopt that section). Although the Supreme Court of Pennsylvania cited *Chuy* as an example of how "[v]arious other courts have incorrectly taken the view that this Court has adopted section 46," *id.* at 185 n. 1, 527 A.2d at 989 n. 1, we believe this means only that if *Chuy* is read to imply Pennsylvania has already fully accepted § 46, it is incorrect. *Chuy* is thus continuing precedent for the proposition that Pennsylvania will impose liability for intentional infliction of severe emotional distress in an appropriate case. Absent a clearer statement from Pennsylvania's highest court, we remain bound by *Chuy. See* 3d Cir. IOP Chapter 8 C. [Policy of Avoiding Intra–Circuit Conflict of Precedent].[11]

---

**9.** Traditionally, Pennsylvania permitted recovery for emotional distress only if it was accompanied by a physical injury or impact. *Kazatsky,* 515 Pa. at 191, 527 A.2d at 992. In 1970, the court first recognized "a limited exception to the impact rule ... only where the plaintiff was in personal danger and actually feared physical impact." *Id.* at 192, 527 A.2d at 992 (citing *Niederman v. Brodsky,* 436 Pa. 401, 261 A.2d 84 (1970)). This was extended in *Sinn v. Burd,* 486 Pa. 146, 404 A.2d 672 (1979) (plurality opinion) to allow recovery by plaintiffs outside the zone of danger who witnessed serious injury to a close relative, but in *Mazzagatti v. Everingham,* 512 Pa. 266, 516 A.2d 672 (1986), the court declined to authorize relief to those who learned of such an injury from a third person. *Kazatsky,* 515 Pa. at 193–94, 527 A.2d at 992–93.

**10.** We believe concern over the difficulty of providing a precise definition of "outrageous" conduct and the consequent fear of standardless jury determinations of liability may have motivated the court to require, on the issue of damages, competent medical testimony that the conduct resulted in severe emotional harm. *See id.* at 193–97, 527 A.2d at 993–95 (noting difficulties with subjectiveness of § 46's concept of outrageousness and that this is exacerbated by fact that finding of outrageous conduct may, in effect, prove dispositive on damages).

**11.** Appellants also rely on two lower court decisions to support their argument that there is no liability in Pennsylvania for intentional inflic-

tion of severe emotional distress. In *Daughen v. Fox,* 372 Pa.Super. 405, 539 A.2d 858 (1988), the Superior Court quoted from *Kazatsky* to show that "our Supreme Court does not look benevolently upon section 46 and it waits until another day to determine its viability as part of Pennsylvania law." *Id.* at 418, 539 A.2d at 864. The *Daughen* court held that even under § 46 there could be no liability because the conduct was not outrageous. *Id.*

In *Ford v. Isdaner,* 374 Pa.Super. 40, 542 A.2d 137 (1988), the Superior Court was more direct. Citing *Daughen,* it stated flatly that "*Kazatsky* makes clear that the tort of intentional infliction of emotional distress is not recognized in Pennsylvania." *Id.* at 44, 542 A.2d at 139.

However, more recently, the en banc Superior Court refused to find liability under *Kazatsky* without questioning whether the tort exists in Pennsylvania. *See Paul v. Lankenau Hosp.,* 375 Pa.Super. 1, 21, 543 A.2d 1148, 1158–59 (1988) (en banc) (tort elements well settled but conduct not outrageous and insufficient competent medical evidence). Other post-*Kazatsky* decisions also appear to recognize liability for intentional infliction of severe emotional distress. *See Rinehimer v. Luzerne County Community College,* 372 Pa.Super. 480, 494–96, 539 A.2d 1298, 1305 (1988) (well settled that cause of action for outrageous conduct exists, but no liability because conduct not outrageous and no competent medical evidence of emotional distress); *Salerno v. Philadelphia Newspapers,* 377

However, to the extent that *Chuy* may be read inconsistently with *Kazatsky*, it is no longer law in this Circuit. *Chuy* recognized that the tort had four elements: the conduct must be extreme and outrageous, it must be intentional or reckless, it must cause emotional distress, and the distress must be severe. *Chuy*, 595 F.2d at 1273. We construe *Kazatsky* as limiting the scope of liability by requiring competent medical evidence of causation and severity. It does not alter a plaintiff's burden to prove that the conduct was both intentional and outrageous.

## IV.

■ Appellants attack the sufficiency of the evidence with respect to each of the four elements we have recognized. We have little difficulty in determining the evidence was sufficient to take Williams's case to the jury on the intentional nature of appellants' conduct.[12] Although the case is close, we believe a jury could also find the conduct outrageous. Williams established that his landlord, in attempting to evict him from the premises, removed the door to his apartment; after tricking him into giving up his keys, told a police officer that he was a trespasser; gave him no opportunity to remove his belongings at that point; publicly announced that he was evicted for running a house of prostitution; and threw his belongings into the street. Even a person who is unable to pay his rent is entitled to be treated with minimal human dignity. Under *Kazatsky*, we believe a jury could conclude that appellants' conduct fell far enough below community standards to be outrageous.

We recognize that Pennsylvania courts have been cautious in permitting recovery for intentional infliction of severe emotional distress. *Bradshaw v. General Motors*, 805 F.2d 110, 114 (3d Cir.1986). They have, however, been more amenable to such claims when they involve the special relationship between a landlord and a tenant, or a parent and child. *Id.*[13] Pennsylvania courts have also indicated they will be more receptive where there is a continuing course of conduct. *See Pierce v. Penman*, 357 Pa.Super. 225, 236, 515 A.2d 948, 953 (1986) (repeated failure over period of years to provide records to former patient with known emotional difficulties), *allocatur denied*, 515 Pa. 608, 529 A.2d 1082

Pa.Super. 83, 87–88, 546 A.2d 1168, 1172–73 (1988) (liability for intentional infliction of severe emotional distress recognized, but grant of summary judgment affirmed because conduct not outrageous).

**12.** Since we conclude that Williams established appellants' conduct was intentional, we need not decide whether after *Kazatsky* a plaintiff may recover for reckless infliction of severe emotional distress.

**13.** Certain provisions of the Pennsylvania Landlord and Tenant Act of 1951, 68 Pa.Stat.Ann. §§ 250.101 to 399.18 (Purdon's 1965 & 1988 Supp.) (Act) also evidence that state's tenant protective policy. They include § 501's provisions concerning a notice to quit:

In case of failure of the tenant, upon demand, to satisfy any rent reserved and due, the notice, if given on or after April first and before September first, shall specify that the tenant shall remove within fifteen days from the date of the service thereof, and if given on or after September first and before April first, then within thirty days from the date of the service thereof.

*Id.* at 250.501 (Purdon's Supp.1988). The notice continues to be a prerequisite to invoking the judicial procedures of the Act. *See id.* § 250.502 (complaint shall set forth, *inter alia*, that notice was given) (repealed by the Judicial Act Repealer Act of 1978, P.L. 202, No. 53, § 2(a)[1271], effective June 27, 1980, but replaced by procedural rule 246 Pa.Code § 503 (1988) (complaint in actions for judgment of possession shall set forth, *inter alia*, that notice was given "in accordance with law")).

The Landlord–Tenant Act provides that all inconsistent acts are repealed and that "[i]t is intended that this act shall furnish a complete and exclusive system in itself." 68 Pa.Stat.Ann. § 250.602. Pennsylvania law is therefore unclear as to whether self-help is still available to a landlord. We have found no appellate decisions limiting the use of this remedy. However, at least two Courts of Common Pleas have held that self-help is no longer available for non-payment of rent. *Lenair v. Campbell*, 31 Pa.D. & C.3d 237, 241–42 and n.* (Philadelphia County 1984) (given scheme of Act, self-help not available and noting other Court of Common Pleas' decisions "which have condemned self-help and granted injunctive relief to tenants"); *Wofford v. Vavreck*, 22 Pa.D. & C.3d 444, 449–51 (Crawford County 1981) (although Act did not eliminate self-help, this remedy no longer available for non-payment of rent on public policy grounds).

(1987); *Dawson v. Zayre Dep't Stores*, 346 Pa.Super. 357, 361, 499 A.2d 648, 650 (1985) (no liability for one racial insult of customer and noting that there were no "continuous malicious actions"). Here, there is not only a landlord-tenant relationship, but also a series of acts approaching a course of conduct.

With respect to the "objective proof" of the severity of Williams's condition, Dr. Van Vyven testified that Williams suffered from a depressive disorder, and that the symptomology of a depressive disorder is "more debilitating" than that of an adjustment disorder. App. at 2–8. She said that he had concentration problems, feelings of helplessness, lacked motivation and suffered from a significant degree of sleeplessness. She concluded that Williams suffered from a "severe set of depressive symptoms," which included embarrassment and humiliation. *Id.* at 2–9 to –10. Significantly, she noticed improvement after Williams began taking antidepressant medication. It is true that she never testified as to how debilitating a depressive disorder is, either in general or in Williams's case and did not say how Williams's depressive disorder, and its attendant symptomology, compared to others she had treated. Nevertheless, we cannot say that the record is so lacking in clinical findings, definitions, or other evidence that there is insufficient competent medical proof of severity.

Finally, we reject appellants' argument that Williams did not show that the eviction severely affected his prior living pattern, or increased his lack of motivation or feelings of loss of control. They note that Williams left his employment with the federal government in March, 1986, intending to live off his savings, and argue that there is insufficient evidence of how the distress from his eviction markedly differed from his earlier reaction to his divorce. Dr. Van Vyven, however, stated that the eviction aggravated any pre-existing condition that Williams may have had and was at least a substantial cause of his depressive disorder. This is sufficient competent medical evidence to take his claim to the jury.[14]

We will therefore affirm the district court's entry of judgment on the jury's verdict.

---

**14.** Appellants also raise several challenges to the punitive damages award. We have reviewed all of their contentions and find them to be without merit.